IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2018 Session

**CLAUDE FRANCIS GARRETT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 92-B-961      Seth Norman, Judge**

_____

**No. M2017-01076-CCA-R3-ECN**
_____

In 2003, a Davidson County jury convicted the Petitioner, Claude Francis Garrett, of first degree felony murder. On direct appeal, this court affirmed the Petitioner's convictions. *See State v. Claude Francis Garrett*, No. M2004-02089-CCA-R3-CD, 2005 WL 3262933, at *1 (Tenn. Crim. App., at Nashville, Dec. 1, 2005), *perm. app. denied* (Tenn. May 1, 2006). This court denied the Petitioner's subsequent petition for post-conviction relief, *Claude F. Garrett v. State*, No. M2011-00333-CCA-R3-PC, 2012 WL 3834898, at *1 (Tenn. Crim. App., at Nashville, Sept. 5, 2012), *perm. app. denied* (Tenn. Feb. 25, 2013), following which he filed a petition for a writ of error coram nobis that is the subject of this appeal. The trial court issued an order summarily dismissing the petition. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

James A. Simmons, Hendersonville, Tennessee, for the appellant, Claude Francis Garrett.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I.   Facts**

This case arises from the Petitioner lighting his residence on fire after locking the victim, his girlfriend, in a utility closet. The Petitioner was indicted for first degree

felony murder and a Davidson County jury convicted him as indicted. His conviction was vacated on appeal when this court determined that the State had withheld exculpatory evidence. *Claude F. Garrett*, 2012 WL 3834898, at \*1. The Petitioner was tried a second time and again convicted and sentenced to life in prison. *Claude Francis Garrett*, 2005 WL 3262933, at \*1. The Petitioner filed direct appeals following both his first and second trial, as well as filed two petitions for post-conviction relief and appealed those judgments. As a result, this court has filed four separate opinions in this matter and summarized the facts in each one. *See State v. Claude Francis Garrett*, No. 01C01-9403-CR-00081, 1996 WL 38105 (Tenn. Crim. App. Feb.1, 1996); *Claude Francis Garrett v. State*, No. M1999-00786-CCA-R3-PC, 2001 WL 280145 (Tenn. Crim. App. March 22, 2001); *State v. Claude Francis Garrett*, No. M2004-02089-CCA-R3-CD, 2005 WL 3262933 (Tenn. Crim. App. Dec.1, 2005), *perm. app. denied* (Tenn. May 1, 2006); *Claude F. Garrett v. State*, No. M2011-00333-CCA-R3-PC, 2012 WL 3834898, at \*1 (Tenn. Crim. App., at Nashville, Sept. 5, 2012), *perm. app. denied* (Tenn. Feb. 25, 2013). In the interest of judicial efficiency, we will include excerpts from the procedural history of the case and recitation of the facts, relevant to the issues the Petitioner raises in this appeal, contained in this court's most recent opinion affirming the denial of the Petitioner's second post-conviction petition as it pertains to the Petitioner's second trial:

> The Petitioner's conviction for first degree murder arose from a charge that on February 24, 1992, he set fire to the Davidson County home that he shared with the victim, Lori Lance. The victim, who was the Petitioner's girlfriend, was found by firefighters behind a closed door inside a utility room in the rear of the house. She died from smoke and gas inhalation. The State's evidence showed that the utility room door was latched from the outside and that an accelerant was used to start the fire.

> The Petitioner originally was convicted by a jury in 1993 of first degree felony murder and sentenced to life imprisonment. The Petitioner's conviction was affirmed on direct appeal. He subsequently filed for post-conviction relief, alleging that the State had withheld exculpatory evidence. On appeal from the trial court's denial of post-conviction relief, this Court determined that the State, in fact, had withheld exculpatory evidence, and we vacated the Petitioner's conviction and sentence and ordered a new trial. At his second trial, in 2003, a jury again convicted the Petitioner of first degree felony murder, and he was sentenced to life imprisonment. This Court affirmed the conviction on direct appeal.

> On April 17, 2007, the Petitioner filed a pro se petition for post-conviction relief, which was amended by appointed counsel on April 6, 2010. The amended petition, which incorporated the pro se petition by

2

reference, set forth three principal grounds for post-conviction relief: (1) that new scientific evidence established that the Petitioner was innocent of the offense for which he was convicted; (2) that the Petitioner received ineffective assistance of counsel at his second trial; and (3) that the trial court abused its discretion in allowing the State's expert witness, James Cooper, to testify.

After an evidentiary hearing held August 30, and October 13, 2010, the post-conviction court denied the petition, and the Petitioner now appeals. On appeal, the Petitioner's sole argument is that he received ineffective assistance of counsel at his second trial. From our review of the Petitioner's appellate brief, we discern three facets to his ineffective assistance of counsel claim: (1) that trial counsel failed to present evidence that in the ten years between the first and second trials, the methods by which the State's expert witness Cooper reached his conclusion of arson had been discredited by the scientific community; (2) that trial counsel failed to advance the defense theory of an accidental fire by not calling the treating physician, Dr. Robert Roth, as a witness regarding the burn patterns on the bodies of the Petitioner and the victim; and (3) that trial counsel failed to move for a mistrial when the State and the State's witnesses referenced the Petitioner's prior trial.

A more thorough summary of the facts adduced at trial can be found in this Court's opinion on direct appeal. In the interest of clarity and conciseness, we will limit our recitation of the facts below to those relevant to the issues the Petitioner raises on appeal.

. . . .

James Cooper testified that he had retired as an agent of the United States Department of Treasury Bureau of Alcohol, Tobacco and Firearms (ATF). As an ATF agent, he had been a certified fire investigator and a fire-cause and origin specialist. Because local authorities had requested that he assist in investigating the fire that killed the victim, he inspected the house on the evening of February 24, after the fire department had washed the flooring with a booster hose. He opined that the washing did not obstruct or hamper his observation of the burn pattern. He concluded that the fire began in the front room. He found no evidence of an electrical or other accidental cause of the fire. A kerosene

3

heater found in the bedroom was not the cause of the fire. He discovered a saturation of kerosene in the kitchen. The utility room door was closed during the fire. Mr. Cooper testified that [Metro Fire Department Captain] Otis Jenkins told him that he had "had to use two hands to slide the bolt on the latch to the other side to open the door."

Mr. Cooper testified that he collected material from beneath the baseboard in the front room because liquid spilled in the floor would typically run under a baseboard and because the flooring beneath the baseboard was free of foot traffic occurring during and after the firefight. Also, he found a "V" pattern on the baseboard, which to him was "like a red flag waving at you," indicating an accelerated fire. Mr. Cooper presented a number of pictures and slides of the fire scene. He opined, "[T]his was a deliberately set fire, arson. Somebody went into the house, and their design, their intent, was to spread the fire from the front room to the back where the victim was."

Defense counsel engaged Mr. Cooper in a rigorous cross-examination, during which the witness testified that the kitchen floor contained "[q]uite a bit of water," that a portion of the liquid on the bedspread was water, and that he relied upon Detective Miller's report of his interviews of the firefighters and did not interview them personally other than to talk with Otis Jenkins. Mr. Cooper did not see the house before the booster-hose cleansing and did not see the front-room furniture in its pre-fire position. He insisted, however, that the flooring in the front room evinced a "pour pattern," indicating that a liquid accelerant had been poured in the floor. He admitted that polyester from furniture could melt onto the floor and simulate a pour pattern but maintained that he could distinguish a pour pattern from a polyester meltdown. He admitted that one photograph showed that the latch bar was dark, as if it was coated in carbon, which might indicate that the bar was not inserted into the latch housing during the fire.

For purposes of this opinion, we supplement our prior summary of Cooper's testimony with the following relevant facts. During cross

4

examination, trial counsel asked Cooper to describe "flashover."[1] Cooper explained that flashover occurs when "everything in [a] room reaches its combustible ignition." As a fire in a room grows, superheated gases rise until they become trapped by the ceiling and begin to bank down towards the floor. Eventually, the "whole room will be in fire, from the ceiling down to the floor. That is a flashover." Cooper acknowledged that the living room in this case appeared to have been fully involved in fire. Cooper also acknowledged that flashover can occur with or without the use of an accelerant and that the radiant heat caused by flashover can create burn patterns on the floor because the heat ignites the floor.

Trial counsel asked Cooper whether he could distinguish burn patterns on a floor caused by radiant heat from those created after pouring and igniting an accelerant on the floor. Cooper answered:

> [R]adiant heat normally, normally, will burn, coming from the ceiling down, uniformly, even. A pour pattern will be irregular and into the floor[,] into the wooden material. But the radiant heat can, also, indicate a pour pattern if the air movement changes. As an investigator you have to realize that. And that's why you have to be careful not to jump the gun. I am satisfied in front of that door, inside the front door, is radiant heat. I am satisfied in the center of the living room, near that window, there is a pour pattern.

Trial counsel asked Cooper on what scientific basis he formed his opinion that a pour pattern existed on the living room floor. Cooper replied that he used his experience and training in determining the presence of a pour pattern. Cooper elaborated:

> I have set fires . . . pouring things. I have spilt [sic] things, to see the difference in an accidental spill and a deliberate pour. I have talked to other investigators, where they call radiant heat arson. They call it a pour pattern. Through my training, I can make that distinction from pour pattern versus radiant heat. Now radiant heat can be irregular. It all depends on what is going on inside the interior of that building at the time.

---

[1]"Flash over" and "flashover" have been used interchangeably throughout the record and transcripts.

When asked about the possibility of error in his analysis, Cooper responded:

> I don't know. I mean, all I can testify to is, I've done pours. I've done accidental spills. I have been on another fire fatality where another investigator called radiant heat a pour pattern, and I actually said, it is radiant heat. Just through my training and experience.
>
> . . . [I]f I'm proven wrong I will admit I am wrong. But on this one, no sir. I was there. I saw it with my eyes. And, I know the difference in radiant heat and a pour pattern, sir.

Trial counsel then asked Cooper whether he performed his fire investigations using the scientific method, which trial counsel defined as "defining a problem, collecting relevant data, and then analyzing that data and applying it to the problem." Cooper replied that he did so in this case. Cooper explained that when forming his hypothesis certain things stood out:

> [A]ll these abnormal things come together[.] [N]ot one thing stands by itself. The pour pattern in the living room does not stand by itself. You have to have the bedspread. You have to have the kerosene can. You have got to have that latch on the door. You have got to have the smoke alarm. And you have got to have where [the victim] was found, and what was on top of [the victim]. That is the hypothesis. The hypothesis is the cause of the fire, which was arson . . . .
>
> . . . .

The defense's theory at trial was that the fire was accidental. As part of this strategy, the defense sought to prove that the burn patterns on the living room floor were caused by radiant heat during flashover. The defense also sought to prove that the burn patterns on the bodies of the victim and the Petitioner were similar. The defense proposed that the similarity of their burns proved that they had been exposed to the fire at the same time, thus negating the possibility that the Petitioner locked the victim in the utility room and started the fire. In this Court's prior opinion, we summarized the testimony of the defense's expert witness, Stuart Bayne:

Stewart [sic] Bayne testified for the defendant as an expert in fire investigation and fire science. He acknowledged that he did not visit the scene of the fire until after the house had been restored but maintained that he has testified in other cases despite being unable to personally inspect the fire scene. In the present case, he studied the records from the first trial, interviewed the firefighters, and examined the pictures.

Testifying at trial, Bayne summarized the defense's theory as follows:

This fire was a Class A fueled with paper and plastic fabrics, accidental naturally growing, meaning unaccelerated by any petroleum compound type fire. Secondly, analysis of the burn patterns on Ms. Lance and Mr. Garrett prove that Ms. Lance and Mr. Garrett were exposed to that fire at the same point in time with the fire as the fire growth. Furthermore, their burn patterns indicate a directional quality to the fire, and a height in the room to the fire. My findings included that this fire was not fueled by kerosene, the point of origin was not on the floor, rather it was in the love seat. And the ignition source was the carelessly dropped cigarette from an intoxicated, wasted as it were, person.

As we stated in our prior opinion:

Mr. Bayne elaborated that based upon the medical reports, the victim and the defendant sustained burns on their faces and left arms as a result of being exposed to the flames in the living room at the same time. He opined that because the burns were on the upper portions of the victim and the defendant, the fire did not originate in the floor. He believed that the burns on the couple were consistent with them trying to reach the front door and with the defendant's statement to him that, after a night of drinking, the couple returned home and smoked cigarettes, with the victim falling asleep on the love seat and the defendant falling asleep on the couch.

7

Mr. Bayne opined that the fuel load in the front room, including the furniture and the wood paneling covering the sheetrock walls, explained the fire growth. He opined that the defendant did not receive his burns from igniting kerosene and that it was "impossible" for the victim to have received her burns from inside the utility room. He dismissed the burn pattern on the front room floor as resulting from radiant heat or "flash over."

Mr. Bayne testified that the utility room door edge had scuff marks which indicated that the door stuck in the door frame. He testified that the defendant confirmed to him that the door tended to stick. Mr. Bayne opined that the latch bar was "very carbonized."

On cross-examination, Mr. Bayne testified that in reaching his conclusions, he ignored Otis Jenkins' claim that the utility room door had been latched. He declined to say how much time elapsed between the deposit of a lit cigarette in the love seat and the onset of a blaze, although he suggested that the process could take minutes or hours. He opined that the presence of the plastic container of kerosene in the kitchen was irrelevant to the cause of the fire. He conjectured that because the container had three holes in the top, the firefighters or investigators could have sloshed some of the kerosene onto the bedspread.

In addition to these facts, we note that Bayne testified that the alleged area of origin had "a very uniform floor burn pattern indicative of radiant heat and flash over." Regarding the burn injuries to the bodies of the victim and the Petitioner, Bayne disagreed with Dr. Harlan's conclusions. Bayne explained that burn patterns on bodies can tell an investigator about the relative intensity of a fire, the direction of the heat source relative to a person's body, and a fire's developmental timeline. Bayne reviewed the medical records and autopsy in this case, and he compared and analyzed the burn patterns on the victim and the Petitioner. Bayne asserted that the body burns were consistent with the version of events that the Petitioner had relayed to him. He testified that the Petitioner had told him that the Petitioner had awoken to a fire, grabbed the victim's hand, and headed to the front door, exposing their left sides to the fire. At that point, as the Petitioner was attempting to open the front door, the

8

victim retreated into the house.  Bayne said that it was "impossible" for the victim to have received her burns in the utility room because the utility room never reached a temperature adequate to deliver the particular types of burns that the victim sustained.  Bayne also explained that kerosene is not volatile or flammable like gasoline and will not explode upon ignition.  Thus, the Petitioner could not have received his burns by igniting kerosene.  After comparing the burn patterns for the jury, Bayne opined that "those two human bodies were standing in the same place at the same time in the relative intensity of the fire, from the growth of the fire."

After hearing this and other evidence, the jury found the Petitioner guilty of first degree felony murder.  He was sentenced to life imprisonment.  His conviction was affirmed on appeal, and he filed the instant petition for post-conviction relief alleging ineffective assistance of counsel.

### Evidence at Post-Conviction Hearing

A post-conviction hearing was held over two days, August 30, and October 13, 2010.  At the hearing, the post-conviction court heard the testimony of John Joseph Lentini, trial counsel, Bayne, the Petitioner, and Dr. Robert Roth.

Lentini testified as an expert in the field of fire analysis and fire science.  Lentini stated that he had personally investigated over 2,000 fires but that he primarily reviews the fire investigations of others.  Lentini is certified by the National Association of Fire Investigators and the International Association of Arson Investigators ("IAAI"), and he discussed in detail his education, qualifications, and peer-reviewed publications.

Lentini claimed to be familiar with the history and development of fire science and investigation.  He defined "fire science" as "the application of the laws of chemistry and physics to the investigation of fires."  Lentini said that he is a member of the National Fire and Protection Association ("NFPA") Technical Committee, which is responsible for the maintenance of NFPA 921, Guide for Fire and Explosion Investigations.  Lentini stated that NFPA 921 presently represents the standard of care in fire investigations.  In 1985, the NFPA Standards Council "became concerned about the quality of work that they saw in fire investigations" and produced NFPA 921 as a guide for fire investigators.  NFPA 921 was first published in 1992 and gained gradual acceptance over the following years.

9

According to Lentini, in 2000, the United States Department of Justice embraced NFPA 921 as a benchmark and the IAAI called it the de facto standard of care. Lentini stated that it was the embrace of the scientific method that led to the acceptance of NFPA 921 as the standard of care in the field. On cross-examination, Lentini acknowledged that NFPA 921 had undergone revisions since its original publication in 1992. Lentini believed that such revisions represented a feature of NFPA 921 as it is "constantly reviewed by the fire investigation community, commented on, and maintained as a standard."

Lentini discussed certain "mythologies" of arson investigation, which he claimed many arson investigators previously embraced but have since been discredited by the scientific community. Lentini read from a National Academy Report on the State of Forensic Science issued in February, 2009. Specifically, the concluding paragraph of the report's discussion on fire and arson investigation, stated as follows:

> By contrast, much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants. Despite the paucity of research, some arson investigators continue to make determinations about whether or not a particular fire was set.

> However, according to testimony presented to the committee, many of the rules of thumb that are typically assumed to indicate that an accelerant was used (e.g., alligatoring of wood, specific char patterns) have been shown not to be true. Experiments should be designed to put arson investigations on a more solid scientific footing.

Lentini testified that he had reviewed portions of the record in this case, including Cooper's trial testimony, Cooper's investigation report, and photographs of the fire scene. Lentini stated that from reviewing the photographs, "it was pretty clear that the fire originated in the living room, [and] it was pretty clear that it went to flashover." Lentini explained further that, when fires achieve flashover, they light the floor on fire. A lot of time—in fact, early in my career that was considered to be a suspicious thing because fires burn up and the floor shouldn't burn, but it is now pretty well accepted that when a room becomes fully involved one of the things

10

that is going to burn is the floor and you, typically, get irregular burns on the floor.

When asked whether he had identified any "mythology" in this case, Lentini responded:

> The only mythology is the belief on the part of the investigator that he can, by looking at the floor, determine the difference between charring done by radiation and charring caused by a flammable liquid.

> Then he goes one step further and believes that he can tell the difference between flammable liquid charring caused by a spill, an accidental spill, or flammable liquid charring caused by an intentional pour, and that is just beyond the scope in terms of what is valid or what is generally accepted as valid in fire investigation.

Trial counsel also testified at the post-conviction hearing. At the time of the hearing, trial counsel had practiced criminal defense law for fifteen years. Trial counsel represented the Petitioner in his prior successful post-conviction proceedings and continued to represent the Petitioner during the second trial. Trial counsel recalled hiring Bayne as an expert in arson investigation to assist the defense in proving that the fire had not been intentionally set. Trial counsel relied on Bayne to assist him in preparing for and examining the State's expert witnesses. He stated that he had "lots of meetings" with Bayne in preparation for trial.

Bayne, who qualified as an expert at the second trial, was also qualified as an expert in fire analysis at the post-conviction hearing. He stated that he first became involved in the case in the fall of 2001. He explained that his role on the defense was to "render an independent origin and cause determination" as to the fire and to offer his analysis at trial. In order to do so, he communicated with trial counsel and the Petitioner, reviewed the case file, and interviewed firefighters who responded to the scene. He explained that all of his efforts were "toward rendering a technically defensible opinion."

Trial counsel planned to use Bayne's expertise to show that flashover had occurred and that the radiant heat caused by flashover had caused the burn patterns on the floor. Trial counsel also intended to use

11

Bayne's testimony regarding the burn patterns on the bodies of the victim and the Petitioner to advance the defense's theory that the two had been in close proximity to one another at some point during the fire.

. . . Bayne told trial counsel that the evidence Cooper intended to offer was not generally accepted in the scientific community, "especially since 1992." Bayne wrote that in order to rebut Cooper's testimony regarding the pour pattern, "I will use the most commonly accepted publications in the industry and the best consensus document in the field (NFPA 921)." However, Bayne also cautioned trial counsel that he would "lose this [Daubert] challenge because [Cooper] possesses the credentials on paper."

In a May 16, 2003 document, Bayne recommended that trial counsel ask Cooper "technical questions" related to flashover conditions and effects. Bayne also recommended trial counsel ask Cooper what the "current fire technology journals, books, and other treatises say about the damages inflicted upon wood and carpeted floors at flashover-and during postflashover-condition fires." However, Bayne warned trial counsel that "[t]he problem with this line of questioning is that [Cooper] will be responding as one who has learned much in the 11 years since the fire, when he probably could not have answered these questions adequately in 1993."

. . . In preparation for trial, Bayne sent several emails to trial counsel discussing his findings regarding the cause of the fire and various strategies for effectively communicating his conclusions at trial. At the post-conviction hearing, Bayne identified an email to trial counsel in which Bayne relayed his belief that flashover occurred. Bayne also identified a document that he prepared titled "Bayne Direct Testimony," which contained proposed questions for his direct examination. Bayne gave several examples of questions on the list that trial counsel did not ask him. Notably, the proposed list of questions for Bayne's direct examination does not contain questions related to NFPA 921 or changes in the understanding of fire science related to pour patterns in the years between the two trials.

Bayne also discussed several excerpts from the 2001 edition of the NFPA 921, which he claimed that he intended to discuss at trial but was not questioned about by trial counsel. Bayne said that one of the excerpts illustrated "graphically how a fire grows and what happens with the influence of radiant heat in pre-flashover conditions, flashover conditions,

12

and post-flashover or full room involvement." Another excerpt showed the "approximate radiant heat flux" required to cause certain burn injuries to human skin.

. . . .

*Post-Conviction Court's Findings*

After hearing this testimony, the post-conviction court denied the Petitioner's claim for post-conviction relief by written order entered December 17, 2010. In its order denying relief, the post-conviction court addressed a myriad of issues raised by the Petitioner and made several relevant findings.

First, the post-conviction court analyzed the Petitioner's claim that new scientific evidence established his innocence. In doing so, the post-conviction court reviewed the testimony of Lentini and the scientific conclusions that "much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants" and that many of the "generally accepted methods of analysis indicating the use of an accelerant have been proven to be unreliable."

The post-conviction court found Lentini's testimony to be unavailing, stating that:

> Mr. Lentini only testified about his record and accomplishments but nothing relevant to the case under examination. He simply stated that the fire in question was not started by the use of an accelerant but provided no basis upon which this conclusion was founded. Mr. Lentini basically just testified as to his opinion of the science and its evolution.

The post-conviction court also found that Cooper's trial testimony accounted for the possibility that radiant heat damage could sometimes be mistaken for a pour pattern:

> Agent Cooper testified as to various "V-patterns" discovered in the house which he explained would indicate the use of an accelerant in the spread of a fire. With regard to

13

such a pattern discovered underneath some baseboard removed from the living room, he stated that radiant heat damage can sometimes be mistaken for a pour pattern by less experienced investigators but that he possessed extensive experience that provided him with the ability to differentiate between the two. Agent Cooper apparently believed that the evidence pointed to the existence of an accelerant on the baseboard due to the fact that an accelerant would normally run underneath baseboards in this fashion. He also admitted that polyester meltdown from furniture could appear as a pour pattern[,] but he adamantly averred that he could discern between the two based upon his experience as a fire investigator.

The post-conviction court ultimately concluded that the Petitioner had "failed to submit sufficient proof at the evidentiary hearing to show that the fire analysis and investigation in this case was erroneous based upon obsolete techniques that have since been debunked."

*Garrett,* 2012 WL 3834898 at *1-14 (citations omitted).

In holding that the Petitioner's trial counsel had not been ineffective for his alleged failure to present evidence linked to the advancements in fire science, this court made the following statements regarding the evidence presented at trial and at the post-conviction hearing:

[F]rom the testimony at trial as well as the post-conviction hearing, it is apparent that burn patterns may be left on a floor during a fire either through the use of an accelerant or through radiant heat during flashover (or presumably, both). Critically, neither Bayne's nor Lentini's testimony at the post-conviction hearing negated the possibility that a burn pattern could be left from the ignition of an accelerant.

At trial, Cooper repeatedly stated that a burn pattern can be caused by either the ignition of an accelerant or radiant heat. Cooper believed that the burn patterns in this case were indicative of accelerant use while Bayne believed they were caused by radiant heat. Thus, the two possible interpretations of the burn patterns were presented to the jury even if the fact that the scientific understanding of burn patterns had changed was not.

. . . .

14

Cooper readily acknowledged that flashover can create burn patterns and that it appeared to him that the living room underwent flashover. That is, Cooper was aware of the alleged flaw in his methodology. Cooper maintained that, from his experience, and taking all factors into account, he believed that the burn patterns had not been created through flashover.

*Id.* at *20-21.

In this most recent filing, a petition for a writ of error coram nobis, the Petitioner contended that "newly-obtained scientific evidence" would prove that he was not guilty of first degree murder and would prove that the State's evidence at trial was "scientifically inaccurate and untrue." He contended that the "newly-obtained" evidence, attached to the petition, were reports and affidavits from various experts who presented scientific evidence made available in 2016, and that the evidence may have resulted in a different judgment.

On April 20, 2017, the trial court issued an order denying relief. The trial court found:

The grounds upon which the [P]etitioner bases his Petition for Writ of Error Coram Nobis have already been litigated. The Petition[er] has attached three [written] reports [to his petition], the first two authored by Craig Beyler, Ph.D., and the second by John J. Lentini, CFI. Each of the reports base their findings on an analysis of the evidence and testimony presented at the Petitioner's trials. Their analysis is based on the method embodied in NFPA 921. To quote Mr. Lentini's report, "[s]ince 2000, the NFPA 921 has come to be generally accepted by the relevant scientific community. Not only was this information available to trial counsel at the time of the second trial, Mr. Lentini himself testified at the subsequent hearing on the Petition for Post-Conviction Relief. Dr. Beyler's reports merely bolster the opinion and analysis offered by Mr. Lentini. Far from being newly discovered evidence, the attached exhibits represent evidence and issues which have already been litigated. The issue is without merit.

It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner argues that, because newly discovered evidence entitles him to relief, the trial court erred when it summarily dismissed his petition for a writ of

15

error coram nobis. The Petitioner submits that he did not have access to the new scientific information relied on in Dr. Beyler's and Mr. Lentini's reports until 2016. He claims the scientific information showed that the original investigation of the fire was "scientifically bogus" and might have secured his acquittal. The State responds that the reports are merely "newly written opinions" of the evidence presented at trial by the Petitioner's expert witness and thus do not constitute "newly discovered evidence." The State further alleges that the petition was time-barred.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2014). It is well-established that the writ of error *coram nobis* "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *Ricky Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

A petition for a writ of error coram nobis "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Bernardo Lane v. State*, No. W2008-02504-CCA-R3-CO, 2009 WL 4789887, at *5 (Tenn. Crim. App., at Jackson, Dec. 11, 2009), *perm. app. denied* (Tenn. June 17, 2010) (citations omitted). "As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced," might not have resulted in a different outcome. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also Vasques*, 221 S.W.3d at 525-28 (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one).

A petition for a writ of error *coram nobis* must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty

16

days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Harris*, 301 S.W.3d at 144 (citing *Mixon*, 983 S.W.2d at 670. The State bears the burden of raising the statute of limitations as an affirmative defense. *Harris*, 301 S.W. 3d at 144 (citation omitted).

In the present case, the State contends on appeal that the Petitioner's filings are not timely. The judgment in the Petitioner's second trial became final on July 30, 2004, when the trial court entered an order denying the Petitioner's motion for new trial. The Petitioner did not file this petition for writ of error coram nobis until March 31, 2017, more than twelve years later. The State contends in its brief that it failed to raise the statute of limitations as an affirmative defense at the trial level because it was not given the opportunity to do so. The trial court dismissed the petition twenty days after the Petitioner filed it, and before the State filed a response. The State also contends that the trial court did not address the statute of limitations issue when it summarily dismissed the petition. The Petitioner does not address this issue in his brief.

Because the trial court addressed the Petitioner's filings on the merits, and did not address the issue of whether the statute of limitations was a valid defense in this case, we will also review the case on the merits.

We now turn to address the Petitioner's argument that he was entitled to coram nobis relief. The convicting and sentencing jury heard substantial evidence concerning the various experts' opinions about the cause of the fire that resulted in the victim's death. The State's expert, Agent Cooper, testified, in simple terms, that the fire was caused by an accelerant being poured on to the floor of the residence, as indicated by the burn patterns on the floor; in other words, it was intentional. On cross-examination, Agent Cooper acknowledged that a "flashover" appeared to have been present in the fire, which he stated could have occurred with or without the use of an accelerant and could have created the burn patterns. The Petitioner's expert, Mr. Bayne, testified that the fire was fueled not by kerosene but by paper and plastic and was ignited by a cigarette being dropped inadvertently. At subsequent post-conviction hearings, Mr. Bayne and another expert, Mr. Lentini, both testified that the fire had not been intentionally set. Mr. Lentini reviewed Agent Cooper's testimony and investigation and declared that Agent Cooper had relied on an out-of-date and invalid method of fire investigation that had been discredited by the science community.

To his petition for error coram nobis relief, the Petitioner attached a report from Mr. Lentini, offering another opinion on how the fire was ignited, and a report from a new expert, Craig Beyler, with a second new opinion on the cause of the fire. Neither of these reports constitutes "new evidence" as statutorily defined. Rather, as the trial court stated, both reports are merely new opinions on already-presented evidence. How the fire

17

was started was an issue of fact to be decided by a jury, and it was within the jury's purview to credit or discredit the testimony of the experts who stated that it was started intentionally or otherwise.

As the trial court succinctly laid out in its order denying relief, the Petitioner's claims do not raise newly discovered evidence and, we conclude, therefore, that the trial court properly denied the Petitioner's petition for a writ of error coram nobis. The Petitioner is not entitled to relief.

### III. Conclusion

Based upon the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE